**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Criminal No. 1:04cr421 |
| | ) | |
| **NARAN S. IVANCHUKOV** | ) | |

**MEMORANDUM OPINION**

This is a criminal forfeiture proceeding stemming from a conviction of defendant and others for conspiracy to commit immigration fraud in violation of 18 U.S.C. § 371. The question presented is whether a $100,000 blank check given to the defendant by a co-conspirator, which defendant then gave to his attorney for the payment of legal services, must be forfeited to the government as illegal proceeds of the criminal conspiracy pursuant to 18 U.S.C. § 982(a)(6)(A)(ii) or, alternatively, as substitute assets pursuant to 21 U.S.C. § 853(p).

**I.**

The material facts may be succinctly stated.[1] Defendant, Naran S. Ivanchukov, is the owner

---

[1] The facts recited here are derived from the allegations of the indictment, the documents filed by the government and defendant in connection with defendant's plea agreement, as well as the sworn affidavit of George Tsui. It is appropriate to consider Tsui's affidavit in the context of this forfeiture proceeding as Rule 32.2(b), Fed. R. Crim. P. — governing criminal forfeiture — specifies that "the court's determination may be based on evidence already in the record, including any written plea agreement or...on evidence or information presented by the parties at a hearing after...the finding of guilt." Rule 32.2(b)(1), Fed. R. Crim. P. It is equally clear that the traditional rules of evidence do not apply in determining issues related to criminal forfeiture. *See, e.g., United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) (recognizing that "'United States courts have a long history of using reliable hearsay for sentencing' and a 'trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain'"); *United States v. Gaskins*, 2002 WL 459005, at *9 (W.D. N.Y. Jan. 8, 2002) (stating that "as with other sentencing issues, reliable hearsay is admissible" at a forfeiture hearing"), *aff'd*, 364 F.3d 438 (2d Cir. 2004).

1

and president of Global Recruitment and Immigration Services, Inc. (GRIS), a Virginia corporation that, during the course of the instant conspiracy, was engaged in the business of providing immigration-related services to aliens seeking to obtain permanent residence in the United States. One of defendant's co-conspirators, George Tsui, is the owner of U.S. Eagle, which, like GRIS, was engaged in the business of assisting aliens seeking to obtain employment-based legal residence in the United States. Both GRIS and U.S. Eagle were used by defendant and his co-conspirators to facilitate an extensive and lucrative immigration fraud conspiracy. In this regard, the record reflects that GRIS generated revenue of approximately $3.2 million during the course of the conspiracy, while U.S. Eagle generated revenue of approximately $1.3 million,[2] a "substantial portion, if not all, of [which]...were derived from the visa fraud scheme." *In re Restraint of Bowman Gaskins Fin. Group Accounts*, John Doe No. A03-147, n.3 (E.D. Va. Nov. 24, 2004) (Memorandum Opinion) (extending a pre-indictment restraining order imposed on funds that GRIS paid to defendant's daughters for the purpose of preserving these funds for future forfeiture proceedings).

On March 9, 2005, a federal grand jury returned a superseding indictment charging defendant, Tsui and others with, *inter alia*, conspiracy to commit immigration fraud and to make false statements, in violation of 18 U.S.C. § 371. Prior to the filing of the indictment, on October 5, 2004, defendant's nephew, Bemba Balsirov, was arrested on a criminal complaint charging him with this same offense. And, on the day of Balsirov's arrest, federal agents executed search warrants at defendant's residence, as well as at the offices of GRIS and U.S. Eagle. Various items and

---

[2] Indeed, in the Statement of Facts entered into as part of his plea agreement, defendant admitted that GRIS had revenues of approximately $3.2 million during the course of the instant conspiracy, "a substantial portion, if not all, of [which]...were derived from the visa fraud scheme."

documents seized in the course of these searches evidenced the instant conspiracy to commit immigration fraud.

The day after execution of the search warrants, on October 6, 2004, defendant approached Tsui and asked to "borrow" $100,000 so that defendant could pay his attorney for legal services. In the course of this conversation, defendant allegedly told Tsui that he should provide the $100,000 because they were both in legal trouble and, as defendant stated, "If I'm done, you're done," or words to that effect. Desperate "to avoid prosecution for immigration fraud," Tsui wrote a blank check for $100,000 from his equity reserve account at National City Bank and gave the blank check to defendant. According to Tsui, he would not have done so "but for the illegal conduct in which [he and defendant] had both engaged as co-conspirators." Moreover, although defendant referred to the $100,000 payment as a personal loan, Tsui knew that defendant did not have the ability to repay the loan. Indeed, Tsui did not expect to be repaid, as there was no promissory note, no security agreement nor any other documentation to suggest that the $100,000 payment was a loan.

Shortly after Tsui provided the $100,000 check to defendant, defendant gave the check, with the payee line left blank, to his attorney. When Tsui later received a copy of the cancelled check from the back, he observed that the name of defendant's law firm, Duane Morris, had been written in the payee line. In this regard, it appears from the record that the $100,000 provided by Tsui to defendant on October 6, 2004, was ultimately deposited in Duane Morris' account at Wachovia Bank on October 12, 2004.

In the following weeks, both defendant and Tsui continued to engage in fraudulent acts in furtherance of the instant conspiracy to commit immigration fraud. Indeed, both defendant and Tsui continued to take steps to facilitate the fraudulent entry of aliens into the United States, and aliens

did in fact enter the United States thereafter as a result. Eventually, both co-conspirators ceased their criminal conduct and pled guilty to the charged conspiracy — Tsui on July 22, 2005, and then defendant on August 29, 2005.[3] To this end, a Consent Order of Forfeiture was entered on October 17, 2005, requiring defendant to forfeit various items to the United States as illegal proceeds of the conspiracy pursuant to 18 U.S.C. § 982(a)(6)(A)(ii) or, alternatively, as substitute assets pursuant to 21 U.S.C. § 853(p).[4] Yet, the parties were unable to reach agreement on whether defendant should likewise be ordered to forfeit the $100,000 detailed above. The parties submitted supplemental memoranda on this remaining forfeiture issue and, in the course of defendant's sentencing hearing on December 2, 2005,[5] the $100,000 was determined to be subject to forfeiture, both as illegal proceeds of the criminal conspiracy under 18 U.S.C. § 982(a)(6)(A)(ii) or, alternatively, as substitute assets under 21 U.S.C. § 853(p).[6] Recorded here are the reasons underlying that ruling.

---

[3] Specifically, defendant pled guilty to Counts 1 and 69 of a third superseding indictment charging him with (i) conspiracy to commit immigration fraud and make false statements, in violation of 18 U.S.C. § 371 (Count 1) and (ii) conspiracy to defraud the United States, also in violation of 18 U.S.C. § 371 (Count 69).

[4] Specifically, defendant was ordered to forfeit the following property: (i) all assets of GRIS, including all funds in account number 004119025325 at Bank of America; (ii) all assets of International Solutions Group, Inc.; (iii) all funds in account numbers 09L014520 and 09L014538 at Bowman Gaskins Financial Group (also known as Walnut Street Securities, Inc.); (iv) all jewelry and other valuables contained in a small gray safe seized from defendant's home; (v) the real property located at 8370 Greensboro Drive, #911, McLean, Virginia; (vi) all funds in account number 1010035171223 at Wachovia Bank; (vii) a 2003 Lincoln automobile, VIN # 1LNHM82W73Y678351, bearing Virginia Tag No. JCM 8368; and (viii) a sum of money equal to $3,200,000 in United States currency, which the government agreed not to seek satisfaction of from defendant's annuity from the Central Intelligence Agency.

[5] Defendant was sentenced to concurrent terms of imprisonment of 44 months on each of Counts 1 and 69, to be followed by 3 years of supervised release.

[6] As defendant appropriately concedes, forfeiture is a mandatory element of the instant sentence. *See* 18 U.S.C. § 982(a)(6)(B) (providing that "[t]he court, in imposing sentence on a

**II.**

The starting point in the analysis is the express language of the forfeiture statute. And, in this regard, it must be noted that criminal forfeiture is a creature of statute and Congress has enacted a comprehensive statutory scheme applicable to forfeiture proceedings such as the one presented here. Specifically, 18 U.S.C. § 982 provides, *inter alia*, that a defendant convicted of a crime of immigration fraud in violation 18 U.S.C. § 1546, or a conspiracy to commit such a crime as involved in the case at bar, must forfeit to the United States:

> any property real or personal —
> (I) that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or
> (II) that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted.

18 U.S.C. § 982(a)(6)(A)(ii). Forfeiture of any so-called "tainted assets" under 18 U.S.C. § 982, "including any seizure and disposition of the property and any related judicial or administrative proceeding," is governed by the forfeiture provisions set forth at 21 U.S.C. § 853. *See* 18 U.S.C. § 982(b)(1). And that section, in turn, provides, in part, that "[a]ll right, title, and interest in property described in subsection (a) of this section[7] vests in the United States *upon the commission of the act giving rise to forfeiture under this section*." 21 U.S.C. § 853(c) (emphasis added); *see also United*

---

person described in subparagraph (A), *shall order* that the person forfeit to the United States all property described in that subparagraph") (emphasis added); *see also United States v. Monsanto*, 491 U.S. 600, 606 (1989) (stating that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applie[s]").

[7] Congress clearly intended for the relevant forfeiture provisions from 18 U.S.C. § 982(a), such as those relating to immigration fraud violations as involved here, to supplant the parallel provisions provided for drug-related violations in 21 U.S.C. § 853(a). *See In re Bowman Gaskins Fin. Group Accounts*, 345 F. Supp. 2d 613, 619, n.12 (E.D. Va. 2004).

*States v. O'Connor*, 321 F. Supp. 2d 722, 729 (E.D. Va. 2004) (recognizing that "rightful ownership of forfeited funds vests in the United States at the moment the triggering forfeiture act occurs"). Section 853 further requires the forfeiture of substitute assets in the event that tainted assets are unavailable to satisfy a valid order of forfeiture. *See* 21 U.S.C. § 853(p).[8] In this regard, the government's interest in substitute assets, like its interest in tainted assets, vests at the time the act giving rise to forfeiture is committed. *See United States v. McHan*, 345 F.3d 262, 271-72 (4th Cir. 2003) (recognizing that the "relation-back" provision of 21 U.S.C. § 853(c) applies to substitute property); *In re Restraint of Bowman Gaskins Fin. Group Accounts*, 345 F. Supp. 2d 612, 622 (E.D. Va. 2004) (recognizing that the "government's title to substitute property...relates back to the date of acts giving rise to forfeiture"). Moreover, in all cases, the language of the forfeiture statute is to be "liberally construed" to effectuate its remedial purposes. *United States v. McHan*, 101 F.3d 1027,

---

[8] That section provides as follows:

(1) In general
   Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant —
   (A) cannot be located upon the exercise of due diligence;
   (B) has been transferred or sold to, or deposited with, a third party;
   (C) has been placed beyond the jurisdiction of the court;
   (D) has been substantially diminished in value; or
   (E) has been commingled with other property which cannot be divided without difficulty.
(2) Substitute property
   In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court *shall order* the forfeiture of any other property of the defendant, up to the value of any property described in subparagraph (A) through (E) of paragraph (1), as applicable.

21 U.S.C. § 853(p) (emphasis added).

1043 (4th Cir. 1996); *see also* 21 U.S.C. § 853(o) (providing that "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes").

These principles and governing statutory provisions, applied here, compel the conclusion that the $100,000 provided to defendant by Tsui on October 6, 2004, must be ordered forfeited to the government as illegal proceeds of the conspiracy under 18 U.S.C. § 982(a)(6)(A)(ii). To begin with, it should be noted that while the specific $100,000 given to defendant in this instance may not have originated precisely from the $1.3 million in illegal proceeds generated by U.S. Eagle in the course of the instant conspiracy to commit immigration fraud, it was nonetheless the conspiracy that motivated the $100,000 payment. Thus, Tsui confirms in his sworn affidavit that he would not have provided the $100,000 to defendant "but for the illegal conduct in which [he and defendant] had both engaged as co-conspirators." In other words, Tsui would not have provided the $100,000 check to defendant, and defendant likewise would not have received it, but for their joint involvement in the instant conspiracy to commit immigration fraud. This "but for" test has previously been adopted by several circuits to assess the nexus between illegal conduct and property sought in criminal forfeiture proceedings and is equally applicable to the facts presented here. *See United States v. DeFries*, 129 F.3d 1239, 1313 (D.C. Cir. 1997) (recognizing that the "but for" test has been adopted by the First, Second, Third, Seventh and D.C. Circuits); *United States v. Horak*, 833 F.2d 1235, 1242, 1243- (7th Cir. 1987); *United States v. Benyo*, 384 F. Supp. 2d 909, 914 (E.D. Va. 2005).

In sum, it is clear that the timing and circumstances surrounding the $100,000 payment to defendant, made while the conspiracy was still underway and as a result of defendant's and Tsui's ongoing illegal conduct, point persuasively to the conclusion that the payment "constitutes, or is derived from or is traceable to the proceeds obtained directly *or indirectly* from the commission of

the offense." 18 U.S.C. § 982(a)(6)(A)(ii)(I) (emphasis added). Accordingly, the $100,000 is appropriately viewed as illegal proceeds of the conspiracy, and thus tainted assets within the meaning of the statute, and must be forfeited to the government pursuant to 18 U.S.C. § 982(a)(6)(A)(ii)(I).

The $100,000 may alternatively be viewed as a substitute asset under 21 U.S.C. § 853(p), as well. In this regard, it is clear that at the precise moment Tsui handed the $100,000 blank check to defendant, defendant became the holder of a valid and negotiable bearer instrument that he could have used for any purpose. For example, defendant could have written his own name in the payee line and promptly converted the $100,000 into cash;[9] he likewise could have used the check as a retainer to secure alternative legal representation separate and apart from Duane Morris.[10] To be sure, because Tsui provided the check to defendant, rather than to Duane Morris directly, defendant had an unfettered opportunity to write anyone's name in the payee line and thereby transfer title to the instrument to whomever he chose. And, the fact that defendant ultimately provided the $100,000 to Duane Morris for the payment of legal fees does not otherwise alter the analysis, as this fact adds nothing to the calculus in determining whether the funds are properly forfeitable under the statute.[11]

---

[9] Had defendant been paid in cash or had he cashed the blank check, the government clearly could have seized the funds or obtained an order for its restraint had the government learned of the funds before defendant transferred them to the Duane Morris firm.

[10] Moreover, had defendant done so, he could have discharged the new law firm and demanded the return of any unearned portion of the advance. *See In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 643, n. 27 (E.D. Va. 1994).

[11] *See, e.g. Caplin & Drysdale v. United States*, 491 U.S. 617, 630 (1989) (recognizing that "Congress has already underscored the compelling public interest in stripping criminals...of their undeserved economic power, and part of that undeserved power may be the ability to command high-priced legal talent"); *United States v. Wingerter*, 369 F. Supp. 2d 799 (E.D. Va. 2005) (upholding the pretrial restraint of an inheritance received by defendant from his great aunt, which funds therefore could not be used by defendant to pay his legal fees).

This case is clearly distinguishable from a situation where, for example, a hypothetical rich aunt provides a payment for legal services directly to a law firm on behalf of her nephew defendant. Instead, unlike that hypothetical situation, the $100,000 provided by Tsui in this instance was within the sole possession, dominion and control of the defendant, at least for a brief period of time. For this reason, the $100,000 must be ordered forfeited as a substitute asset under 21 U.S.C. § 853(p).[12] Moreover, whether regarded as the proceeds of a loan,[13] or as an outright payment of $100,000, it is clear that title to the $100,000 vested in the United States as a substitute asset at the precise moment defendant received the blank check from Tsui. *See McHan*, 345 F.3d at 271-72.

An appropriate order will enter.

/s/

_____

Alexandria, VA
December 22, 2005

T. S. Ellis, III
United States District Judge

---

[12] Whether Duane Morris might ultimately have a legal right to the $100,000 superior to that of defendant or the government is not at issue here and is instead appropriate for adjudication only in ancillary proceedings under Rule 32.2(c), Fed. R. Crim. P. *See* Rule 32.2.(b)(2), Fed. R. Crim. P. (stating that "[d]etermining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c))."

[13] It is clear that the proceeds of a loan can be subject to forfeiture. *See, e.g., United States v. Boulware*, 384 F.3d 794, 813 (9th Cir. 2004) (total amount of fraudulently obtained loan, without offset for repayments, was forfeitable because title to the property vested in the United States at the time of the crime); *United States v. Navaro-Ordas*, 770 F.2d 959, 969 (11th Cir. 1985) (amount of fraudulently obtained loan proceeds forfeitable as "profits" of RICO enterprise, though they could not be traced to any identifiable asset of the defendant).